IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CR. NO. 12-40119-01-JAR |
| | ) | |
| ROBERT H. HARSHBARGER, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## ROBERT HARSHBARGER'S SENTENCING MEMORANDUM

Mr. Harshbarger has entered into a binding Plea Agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), which sets forth a binding sentence recommendation of 48 months, restitution of $845,504.34, a fine of $25,000 and forfeiture in the amount of $425,000. The Court previously accepted the Plea Agreement, and the final Presentence Investigation Report ("PIR") does not object to the binding sentencing recommendation. Mr. Harshbarger seeks imposition of the agreed sentence.

Pursuant to Fed. R. Crim. P. 32(f), counsel previously objected to certain conclusions within the draft PIR. On September 12, 2013, the final PIR with Addendum was filed ("PIR") (Dkt. 49). Mr. Harshbarger provides this Sentencing Memorandum to note his continuing objections to certain erroneous proposed enhancements and statements contained in the PIR's calculation of the advisory Sentencing Guidelines offense level. The correct offense level is 19, with an advisory range of 30-37 months.

Mr. Harshbarger respectfully states the following objections:

A. The PIR erroneously proposes application of a two-level enhancement for reckless risk of serious bodily injury pursuant to U.S.S.G. § 2B1.1(b)(14)(2012). PIR, ¶ 62.

There is no basis for imposition of this enhancement. Mr. Harshbarger's objection should be sustained.

  B. The PIR incorrectly applies a six-level enhancement under U.S.S.G. § 2B1.1(b)(2)(C) on the unsupportable assumption that the offense involved more than 250 victims. PIR, ¶ 63.

  C. The PIR proposes application of a two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) (vulnerable victim) without any legitimate basis in fact or law. PIR, ¶ 64.

  D. To the extent the PIR seeks a two-level enhancement for abuse of public or private trust pursuant to U.S.S.G. § 3B1.3, or an impermissible double count both for use of a special skill and sophisticated means, such enhancement is improper. PIR, ¶ 66.

## SUMMARY BACKGROUND

**I. Personal**

Robert Harshbarger is a 53-year-old resident of Tennessee with no criminal history whatsoever. PIR, ¶ 73. He has been married for 32 years and has one son, aged 28. PIR, ¶ 77-78. His father is deceased. His mother lives in Johnson City, Tennessee and is retired. She presently is in remission from cancer, but continues to have health problems, including high blood pressure. PIR, ¶ 74. Mr. Harshbarger is the primary care-taker for his mother. *Id.* Mr. Harshbarger also has two brothers, one residing in Kingsport, Tennessee, and the other in North Carolina. PIR, ¶ 76.

Mr. Harshbarger obtained a Bachelor of Science Degree in Chemistry and Microbiology in 1982 at East Tennessee State University. PIR, ¶ 83. He received his Doctor of Pharmacy degree from Southern School of Pharmacy at Mercer University in Atlanta, Georgia in 1986. PIR, ¶ 84. He was a practicing, licensed pharmacist since that time until surrender of his license in connection with this matter.

## II. Business History

Mr. Harshbarger developed a specialty as a compounding pharmacist.

"Compounding" means the preparation, mixing, assembling, packaging or labeling of a drug or device:

(A) As the result of a prescription order or initiative based on the prescriber-patient-pharmacist relationship in the course of professional practice;

(B) In anticipation of prescription orders based on routine, regularly observed prescribing patterns; or

(C) For the purpose of, or as an incident to, research, teaching or chemical analysis and not for sale or dispensing.

Tenn. Code Ann. § 63-10-204(4).

From 2003 through May 2006, Mr. Harshbarger was a compounding pharmacist at The Medicine Shoppe in Kingsport, Tennessee. He founded American Inhalation Medication Specialists, Inc. ("AIMS") in Kingsport, Tennessee in June 2006, and was affiliated with AIMS through September 2010. He was affiliated with Custom Compounding Center of America in Kingsport, Tennessee from October 2010 through August 2012. PIR, ¶ 85-88.

## III. The Plea Agreement

On May 21, 2013, Mr. Harshbarger entered into a Plea Agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C). Pursuant to the Plea Agreement, Mr. Harshbarger agreed to plead guilty to Counts 1 and 3 of the Indictment, charges related to Mr. Harshbarger's long-standing compounding relationship with Kansas Dialysis Services, L.C. ("Kansas Dialysis") wherein he supplied a compounded form of iron sucrose. Count 1 of the Indictment charged a violation of 21 U.S.C. § 331(a), misbranding. The misbranded drug was the non-FDA-approved iron sucrose product, which was administered by Kansas Dialysis to kidney dialysis patients in Kansas. PIR,

¶ 6.[1] Count 3 of the Indictment charged a violation of 18 U.S.C. § 1347, health care fraud. *Id*., ¶ 8.

## IV. Cooperation

As acknowledged in the PIR, Mr. Harshbarger has accepted responsibility for the offenses, and also timely entered into a Plea Agreement. PIR, ¶ 56. Notably, as part of the Plea Agreement, Mr. Harshbarger agreed that he would provide education presentations about misbranding at local, state and/or national pharmacy meetings, at his own expense and for no remuneration. Plea Agreement, ¶ 3(6). On June 3, 2013, Mr. Harshbarger spoke to approximately 200 compounding pharmacist-members of the International Academy of Compounding Pharmacists (IACP) at its Washington, D.C. conference, "Compounders on Capitol Hill." IACP is the industry association that represents nearly every compounding pharmacist in the country.

After a brief introduction, Mr. Harshbarger's counsel, Douglas Farquhar, provided a brief summary of the factual background of this case, Mr. Harshbarger's admissions in the guilty plea, and the significant consequences for Mr. Harshbarger. Mr. Harshbarger then presented a series of slides that recounted the mistakes he made and explained how, if he had acted differently, his conduct would not have constituted a criminal act. As attested in the attached July 9, 2013 letter from Mr. Farquhar to AUSA Treadway, Mr. Harshbarger's presentation was extremely well received. (Exhibit A). Mr. Harshbarger also spoke at a conference of the Professional Compounding Centers of America on October 26, 2013, in Houston, Texas.

---

[1] The FDA has not approved a generic form of iron sucrose, which limits the sources that can manufacture and distribute the product.

4

# ARGUMENT

I. **The Correct Advisory Guidelines Calculation Provides a Sentencing Range of 30-37 Months**

The Plea Agreement adopts a binding sentencing recommendation of 48 months. Plea Agreement, ¶ 16; PIR, ¶ 94. The PIR recognizes this binding sentence recommendation and does not object to it. Still, it outlines a series of enhancements and incorrectly concludes that the total offense level is 31 and the advisory Guidelines imprisonment range is 108 months to 135 months.[2] PIR, ¶ 92. Mr. Harshbarger objects to the following enhancements: reckless risk of bodily injury (*Id.*¶ 62); offense involving more than 250 victims (*Id.*¶ 63); the victims were "vulnerable victims" (*Id.*¶ 64); and abuse of public or private trust or the application of both an enhancement for sophisticated means and special skill (*Id.*¶ 66). A correct advisory range is 30-37 months.

   A. **Reckless risk of serious bodily harm does not apply**

A sentencing enhancement for reckless risk of serious bodily harm is not appropriate pursuant to U.S.S.G. § 2B1.1(b)(14)(2012). The Tenth Circuit has interpreted the Guidelines enhancement to require a defendant to have been conscious of *or* reckless as to the existence of the risk created by his or her conduct. *U.S. v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011) (applying enhancement where defendant stole radioactive gold). "Generally, recklessness is an objective standard, and we interpret 'reckless risk' to describe objectively culpable conduct. We hold that a defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves

---

[2] The PIR recognizes that the maximum term of imprisonment for Count 1 is three years, and the maximum term of imprisonment for Count 3 is 10 years. PIR, ¶ 92. At times, the PIR refers to Count 2 instead of Count 3. *Id.*, ¶ 92.

5

a reckless risk if the risk of bodily injury would have been obvious to a reasonable person." *Id*. at 1321.

In cases where this enhancement has been applied, the defendant typically was fully aware that his or her actions created a risk of serious bodily injury. *See, e.g., U.S. v. Moon*, 513 F. 3d 527, 542 (6th Cir. 2008) (defendant oncologist billed insurance for full chemotherapy treatments but only administered half treatments on patients); *U.S. v. Lucien*, 347 F.3d 45, 57 (2nd Cir. 2003) (defendants staged car accidents and assigned insurance benefits to health care clinics which generated fictitious treatment records in order to obtain insurance settlements); *U.S. v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002) (defendants participated in a scheme to falsify the results of a study on a cancer drug to show the drug to be more effective in treating lymphoma). Unlike defendants in these cases, Mr. Harshbarger's conduct – as well as tests performed by FDA on samples of the iron sucrose he compounded – demonstrate that he exercised extraordinary measures to ensure that the drugs he compounded did not create a risk of serious bodily injury.

There is no allegation in the Plea Agreement that the misbranded iron sucrose provided by Mr. Harshbarger was not equivalent to the iron sucrose sold as Venofer. The iron sucrose provided by Mr. Harshbarger was chemically indistinct from Venofer, contrary to the government's suggestion that Mr. Harshbarger's iron sucrose product was "significantly different" than Venofer. PIR Addendum, ¶ 122. According to FDA's own tests, the iron sucrose was either within the potency requirement, or very close to the potency requirements, at the end of shelf life or even after expiration. Moreover, there is no suggestion of bodily harm to any patient that received the product. PIR, ¶ 53. Mr. Harshbarger supplied iron sucrose for an extended period of time, and patients were regularly monitored for iron levels. No problems or

issues were ever reported.  There is no realistic claim Mr. Harshbarger was aware that his actions created a risk of serious bodily injury.

Mr. Harshbarger took extensive efforts to ensure the high quality of his products and the drug he was compounding for use by Kansas Dialysis was sterile and effective.  Specifically, Mr. Harshbarger worked in a very sophisticated facility.  The facility had air locks to keep any bacteria from entering the room from the air in the pharmacy.  The air in the room was processed through micron filters so there were less than 100 particles per square foot.  Gowning procedures were used by whoever was operating in the facility to prevent any microbes that were on their body from getting into the equipment.  Any drug compounding materials or components that were brought into the facility were swabbed down with alcohol to prevent microbes.

When preparing the product, Mr. Harshbarger used a multi-filtration process that took several hours.  The solution was placed into sterile containers.  A "bubble test" was conducted, in which air is pushed through the filter to confirm the filters had not broken.  After the product was placed into certified, sterile syringes, additional samples were taken to ensure there was no contamination.  All of these activities were undertaken to produce a safe and effective dose of iron sucrose, which is what happened.  That the iron sucrose sales violated the law is a much different issue than any risk posed.  Simply, patients received the therapeutic benefit of the iron sucrose for years without incident or complaint because Mr. Harshbarger took painstakingly exact measures to create a safe product.

**B.      Enhancement for offense involving more than 250 victims does not apply**

U.S.S.G. § 2B1.1(b)(2) suggests a two-level enhancement if the offense involved 10 or more victims; a four-level enhancement if the offense involved 50 or more victims; and a six-level enhancement if the offense involved 250 or more victims.  The Guidelines Application Notes, No. 1, define "victim" as: "(A) any person who sustained any part of the actual loss

determined under subjection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." "Actual loss" "means the reasonably foreseeable pecuniary harm that resulted from the offense." Application Notes, No. 3.

The PIR acknowledges that the patients that received the iron sucrose product did not suffer physical or financial harm as a result of the offense. PIR, ¶ 53. Further, the interviews conducted by the government established that if harm had been suffered by any of the patients, it would have been detected in short order because of the frequent testing of patients' blood to ensure that iron sucrose levels are adequate. The patients are not victims as contemplated by § 2B1.1(b)(2). And while five federal health care programs did pay for medication that was not FDA-approved, § 2B1.1(b)(2) still is inapplicable because the minimum number of victims necessary for the enhancement has not been met. The government has provided no binding authority in support of this enhancement.

### C. The vulnerable victim enhancement should not apply

U.S.S.G. § 3A1.1(b)(1) provides for a two-level enhancement if the defendant knew or should have known that a victim of the offense was a "vulnerable victim." The Tenth Circuit has held that "in order to classify a victim as 'vulnerable,' the sentencing court must make particular findings of vulnerability. The focus of the inquiry must be on the victim's personal or individual vulnerability." *U.S. v. Kaufman*, 546 F.3d 1242, 1269 (10th Cir. 2008) (quoting *U.S. v. Brunson*, 54 F.3d 673, 676 (10th Cir. 1995)). The district court must determine individually which persons were "vulnerable victims." *Kaufman*, 546 at 1269 (remanding for individual determination of which persons were vulnerable victims).

This enhancement is "reserved for exceptional cases in which the victim is *unusually vulnerable* or *particularly susceptible* to the crime committed." *U.S. v. Proffit,* 304 F.3d 1001, 1007 (10th Cir. 2002) (emphasis in original). "Vulnerable victims" "are individuals unable to

8

protect themselves who therefore require greater societal protection," and "membership in a class of individuals considered more vulnerable than the average individual is insufficient standing alone." *Id*. Additionally, the fact that a company was victimized is insufficient to show that it was especially vulnerable. *Brunson*, 54 F.3d at 677. The government does not dispute that this is the law in the Tenth Circuit. PIR, ¶ 137-139.

There is no support for this enhancement. Certainly the health benefit programs and Kansas Dialysis are not vulnerable and there is no evidence to the contrary. Moreover, there has been no *individual* determination that the patients receiving iron sucrose were unusually vulnerable or particularly susceptible to the crimes charged. Accordingly, a § 3A1.1(b)(1) enhancement is unjustified.

### D. Enhancement for abuse of public or private trust is inapplicable

Based on paragraph 65 of the PIR, it is unclear whether a two level enhancement is sought based on a special skill, as opposed to abuse of a position of public or private trust. PIR, ¶ 66. The Addendum clarifies that the enhancement is based on special skill. PIR, ¶ 144-145. Mr. Harshbarger objects to the application of both a two level enhancement based on special skill and sophisticated means. Application of both enhancements is duplicative. Further, should there be any doubt that the enhancement is sought based on abuse of a position of public or private trust, such an enhancement is erroneous. The Application Note No. 1 to U.S.S.G. § 3B1.3 explains that "public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion. In order for the adjustment to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense. *Id*. "This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's

fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." *Id*.

The enhancement was not intended to apply to all circumstances involving fraud. Rather, there must be something akin to a breach of fiduciary duty. As articulated by the Tenth Circuit: "The fact that this is an enhancement provision by definition means that it is not intended to be applied in every case of fraud." *Brunson*, 54 F.3d at 678. "The guideline enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required." *Id*. There was no breach of fiduciary duty here: the syringes were labeled that they contained iron sucrose, not Venofer, and the syringes would likely have been the only item seen by a patient.

## II. Mr. Harshbarger Objects to Certain Statements in the PIR that were not Alleged in the Indictment or Incorporated in the Plea Agreement

The PIR contains several statements that were not alleged in the Indictment and are not a part of the Plea Agreement. Specifically, Mr. Harshbarger objects to paragraph 36 of the PIR, which discusses a purported discussion on April 4, 2005. Harshbarger also objects to paragraphs 51 and 53, which purport to represent the number of patients that received iron sucrose. Mr. Harshbarger has not had the opportunity to verify this information.

Mr. Harshbarger objects to paragraph 47, which provides that $6,997,622.00 was billed to health care benefit programs by Kansas Dialysis. Mr. Harshbarger has not had the opportunity to verify this information. The government acknowledges that the PIR uses the amount paid by the health care benefit programs as the loss in this case, and it has no objection. PIR, ¶ 151. The government further asserts that the amount billed is significant because when the intended loss is greater than the actual loss, the intended loss is to be used to calculate a defendant's sentence, and that prima facie evidence of intended loss in a health care fraud context is the amount billed.

10

*Id.* However, Mr. Harshbarger, like nearly every health care provider, would not anticipate that federal health care programs would pay the total amount of claims submitted. Rather, health care providers typically submit claims higher than what they expect to receive, and the federal health care programs pay only what they deem allowed, which is less than the amount sought. The amount that is actually paid is set by federal policies and regulations. No one in the process expects that federal programs will pay more.

The government bears the burden of proving the intended loss. "In the health care fraud context, 'the amount fraudulently billed to Medicare/Medicaid is prima facie evidence of the amount of loss [the defendant] intended to cause, but the amount billed does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent.'" *U.S. v. Valdez*, 726 F.3d 684, 696 (5th Cir. 2013) (citing *U.S. v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011)). In *Valdez*, the defendant objected to the loss calculation, arguing that the evidence showed he did not intend to cause the loss of the full amount billed to the programs. Rather, he billed a high amount, knowing that he would only be reimbursed for a fraction of what was billed. *Id.* at 696. The Fifth Circuit determined it was error for the district court to calculate the intended loss without considering the evidence in the record that rebutted the prima facie evidence of intended loss. *Id.*

## **CONCLUSION**

Mr. Harshbarger objects to certain enhancements and allegations in the PIR. The enhancements to which he objects would be erroneously applied, based on the facts and the law. Mr. Harshbarger requests imposition of the sentence set forth in the binding Plea Agreement.

Dated: October 29, 2013              Respectfully submitted,

**BERKOWITZ OLIVER WILLIAMS SHAW & EISENBRANDT LLP**

By:      */s/* Jeff Morris
   Jeffrey D. Morris, KS #16123
   Christina M. DiGirolamo, KS #23406
   Berkowitz Oliver Williams
   Shaw & Eisenbrandt LLP
   2600 Grand Boulevard, Suite 1200
   Kansas City, MO 64108
   Telephone: (816) 561-7007
   Facsimile: (816) 561-1888
   Email:    jmorris@berkowitzoliver.com
             cdigirolamo@berkowitzoliver.com

AND

   Douglas B. Farquhar, Maryland Bar #386573
   Admitted pro hac vice
   Hyman, Phelps & McNamara, P.C.
   700 13th Street NW, Suite 1200
   Washington, DC 20005
   Telephone: (202) 737-9624
   Facsimile: (202) 737-9329
   DFarquhar@hpm.com

**ATTORNEYS FOR ROBERT HARSHBARGER**

**CERTIFICATE OF SERVICE**

This is to certify that on October 29, 2013, I electronically filed the above motion with the Clerk of Court using the CM/ECF system, which will cause the document to be served upon all counsel of record.

   */s/* Jeff Morris
Counsel for Defendant